My name is Williams, and I'm here on behalf of John George. Before I begin, may I reserve three minutes for rebuttal? Yes. Your Honor, this is a case in which Mr. George is charged under 666-A1A of receiving funds. He ran a bus company in the southeast region of Massachusetts. In this particular case, the indictment alleges a number of distinct and disparate acts, but alleges them all in a single count. At the same time, it alleges that the minimum which the statute was violated was any or all of the disjunctive ways the statute could be violated. There are five that are listed. In this particular case, when one looks at the indictment, and I believe it is clear not only from the indictment, but it's also clear from the government's brief on pages 23 through 25, that the vast majority of the alleged acts would never, either individually or as aggregated, reach the monetary threshold of $5,000 in 12 months. As a result, in this particular case, the only event that would have met that monetary threshold was the payments to Samuel Santos, John George, and another individual named Roy Wilker. What of the teaching remodeling? That's what we got to the conspiracy level. We went beyond the statute of limitations with regard to the substantive counts. With regard to the salaries, the question became whether or not, or what the theory of the government was with regard to that particular position. And after it was alleged, and that's when we discussed that it was the only one that would meet it, the defender filed a motion to dismiss and allege a number of different claims, indicating specifically that the res, since there was no allegation that the individuals did not otherwise perform the duties of their jobs, the res was not something that could be stolen if it was simply above the hours they were required to work. After that occurred, the government appeared to have changed their theory and now claimed that it wasn't a theft of the money, and it couldn't be a theft of the money because nothing was paid to George, nor was it a fraud, nor was it an embezzlement, but claimed it was an intentional misapplication of the funds received in the salaries to these particular individuals. Now, with regard to that particular question, the government in its opposing brief says that was simply a choice of words by them, that they had a preference for using intentionally misapplied as compared to embezzlement. During the course of this particular case, before the matter was going to the jury, the government staked out its position again, and it indicated that... But when you say the government staked out its position, doesn't the government stake out its position in an indictment, and the indictment here alleged embezzling, stealing, obtaining by fraud, knowingly converting to a non-owner's use, or intentionally misapplicating? I would say that is what they judge. And didn't the jury instruction fit with that? Before we get to the jury instruction, Your Honor, at the final pretrial conference, after the motion to dismiss has been made, they have now talked about intentional misapplication, there are further arguments at the final pretrial conference with regard to the theory upon which the government is going to proceed on the salaries of these individuals. And the government at that time specifically says that they are going to proceed on a misapplication theory. That's their theory. Because what they claim, Your Honor, is they do not claim, as they said later on in the case, and they always use the words intentional misapplication, they claimed that the issue is not whether or not someone didn't work, it's whether or not they didn't work where they were supposed to. And that was in essence the ground in the entire case. So why weren't the jury instructions then, if you're saying that the government in effect limited the case from what was charged in the indictment, the indictment said alternative, four alternatives with or, and as I understand it you're saying we can read in the transcript a voluntary abandonment of three of those theories by the government. Why would the jury instruction have instructed on all four theories? Because that's what the request of the government was, I objected to those. In fact, I specifically asked the judge that if she were going to instruct on all five of those theories, that she also inform the jury that they had to be unanimous with regard to what theory. That's an entirely different issue. I didn't read your instruction as you're saying to the judge, judge you can't instruct on three of those theories because the government has abandoned them. It seems to me you just said two things, you said one, you want them to be unanimous on whichever one they pick. And two, I think you asked for a willfulness insertion before each of the other three instructions. And which seems to indicate you thought all of them were implied. Well, that goes along with the argument with regard to alleging all the discreet and disparate acts in one count. I was not saying that with regard to the use of the phones, with regard to the allegation that gasoline was being used, with regard to any or all of those others, I was not contending that the government was withdrawing or giving up on their embezzlement theft theory with regard to those. But you could have asked the judge to limit any of those other instructions to specific items and there was no such request. Well, there was only two objections you made and the two that Judge Keanu has identified. I believe in the nature of the request, Your Honor, and the way it comes out in the transcript, is I asked that if she is going to use, if she's going to go along with what the government says, that she ask that it be unanimous. It was at a time, right immediately before that transcript, I explained that I've never heard anything other than intentionally misapplying as it relates to the salaries. I've never heard anything I indicated. I said, therefore, it should go to the jury on that theory with regard to the salaries, which was the only event that could meet the threshold. None of the others could. They were, I don't want to say they were irrelevant, but they were, for example, one of them was plowing that was done on, at Mr. George's father's, who was at the time 92 years old, when I asked the individual on cross-examination, well, how much was that worth? He said pennies. And those were the types of things that the government claimed a form of international calling ability. So where does this lead you then? I take it we're not going, you're not making a point here that the instruction was improper because it wasn't limited, as Judge Selya indicated, you might have asked for it to be limited. Are you saying then that because they limited themselves to intentional misapplication, we should therefore do a sufficiency analysis honing in only on intentional misapplication? Correct. Okay. And why do you say then that is insufficient? I would contend that, why do I say that the evidence is insufficient? Yes. The evidence is insufficient on linking the others because not only was the government able to convince the judge to use an instruction of intentional misapplication. Now you're back. I thought we weren't complaining about the instruction on this point. If I may, Your Honor. Try to stay with the point. I'm staying with the point. Go ahead. Okay. The intentional misapplication was used on each of the other charges. Therefore, the judge indicated that if you're going to find embezzlement, you have to find that he intentionally embezzled. If you find that he stole, you'll have to find that he intentionally stole. If he obtained by fraud, you'll have to find that he intentionally obtained by fraud. Throughout the trial, I have indicated to the judge that intentional doesn't relate to those charges that sound in the nature of velocity. Those require a mental state, a willful mental state. They require some... Now you're offering a different point. Now you're saying the instruction was erroneous because the judge didn't give a willfulness instruction for each of the other three elements. You're losing me, though. I thought your point was that the prosecution abandoned the other three elements with respect to the salaries, point one. Point two, the evidence was insufficient to show that one retained theory, intentional misapplication with respect to the salaries. And my question then is why is that last point so? I thought your question was how did sufficiency, how will sufficiency examination relate under all the others, under the embezzlement. You know what I'm saying? It would have related because the gun didn't prove those... Why don't you answer the question Judge Gallardo actually asked? I'm trying to. All right. So tell us why, with respect to the salaries, why is the evidence insufficient? The evidence is... Intentional misapplication. The evidence is insufficient because the gun's theory was that not present at a particular location meant that they were not working. There were three witnesses who testified with regards to the salaries, the first being an individual by the name of Mullins. She indicated that for a three-month period in 2005, she kept a calendar and her calendar showed when Mr. George and Sandra Santos were not present at the Petonka Street hangar list. There was no indication that she acknowledged that. She could not tell whether or not they were working or whether they weren't working. The second individual was an individual by the name of Alpharus. Basically the same thing. He took still photos sometime for a period of, I think, 60 days, and he saw on occasion that Mr. Roker was coming and leaving at hours that were inconsistent with him being working. So you had a lot of testimony that at the workplace there were no shows, but I think if I'm understanding the argument you're now making, that was insufficient to allow the jury to say there was no work. They could have been working away from the site. Correct. But the nature of the jobs here, was that amenable to, was that such that it would require a jury to find or allow a jury to find that they were doing work away from the site when they weren't there at all? Yes, Your Honor. Specifically with regard to Santos and with regard to Roker, because Santos, who had suffered and battled two cancer operations, one in the brain, was allowed and was given flex time and certain accommodations were made that she could perform her work off-site. And the individual who was the administrator at that time indicated that those decisions, specifically those decisions were solely within the discretion of John Judge. With regard to all the other arguments, I ask you to rely on the brief. Good morning, and may it please the Court, Ryan DeSantis for the United States. Counsel, could I ask you to start where we left off with Mr. Santolo, that is the sufficiency of the evidence with respect to intentional misapplication vis-à-vis the salaries? Yes, Your Honor, I'd be happy to start there. The appellant here says that the government somehow abandoned theories, but that never happened. From the beginning of this case to the end of the case, the government proceeded on each one of the means theories set forth in the indictment and set forth in the jury instruction. It never did anything to abandon any one of them. So are you saying in response to Judge Salia's question that the evidence was sufficient with respect to the salaries on one of the other three alternatives and you didn't abandon those alternatives? But are you impliedly saying it was insufficient on the intentional misapplication so that if we rejected your argument of preservation of those other three, you'd have a problem? No, Your Honor. In fact, I'm saying that the evidence supported proof beyond a reasonable doubt of multiple theories, including intentional misapplication. Could you explain that one? I'd be happy to, Your Honor. The appellant says that you must have an otherwise legitimate purpose in order to have an intentional misapplication. In support of that, he cites this Court's opinion in Cornier-Ortiz's 2004 opinion, in its citation of another Second Circuit case, the Urlacher case, and language used therein. In essence, it's important for the Court to understand the context in which that issue came up in Cornier-Ortiz, in Urlacher, and some of the other opinions that are cited by the defendant, which actually support the government's argument, and I'll get to that. The issue's coming up in the context of the Court considering a challenge to a conviction based on the bona fide salary exception, Section 666C. And as this Court stated in Cornier-Ortiz, it was the interplay between the bona fide salary exception and the intentional misapplication prong of the statute that it was focused on. And what it did in looking at Urlacher was say that the interplay, as explained in Urlacher, was sensible. And that interplay was that the facts that were set forth in Cornier-Ortiz did not fit the bona fide salary exception, but were instead an intentional misapplication for an otherwise legitimate purpose. In Cornier-Ortiz, as the Court likely knows, there was an issue with a consultant who was paid for work when that consultant was in fact conflicted out of the type of work that they had actually performed and been paid for. So there, there was an otherwise legitimate purpose. But in fact, as Newell, another opinion in this Court, and many of the decisions that the defendant cites, say intentional misapplication can include more than just an otherwise legitimate purpose. It can include an illegitimate purpose. For example, in Newell, you had a situation where... But factually, get to what it was here. The point is the fact, as I understand it, what I hear the defendant saying is the fact they weren't in the workplace, I mean, I'm not in my chambers today, but I'm working. I think that's their argument, that they could be doing work outside of... It is. And what the defendant leaves out, Your Honor, is that the facts also show that, for instance, Ms. Santos was working at the farm. And she was opening the farm. She was managing the teenage employees there. So she had two jobs. Well, but she was not doing her job at the Union Street Bus Company. But how do you get... I understand you've proved she wasn't there for a period of time. Don't we need to know something about the job and the job responsibilities? Because, as the example I just gave, if you put on my assistant, who testified that for the first three days in September I was nowhere to be seen in my chambers, I don't think you would have proved your case. You need to say there's something about my job that would make it necessary that I be in chambers in those days. And I think that's the argument the defendant is making here. You haven't proved that there's something about their jobs that would make their absence from the workplace probative. Well, Your Honor, the proof at trial was that Ms. Santos was an administrative assistant. And the things that people testified that she did do were basically office work and then the occasional grievance hearing. And the evidence at trial was she only performed the grievance hearing outside of the office a few times per year for a half an hour to an hour approximately each time. So her job required her to be in the office. But in any event, whatever her job required her to do, the farm workers testified that she was there at the farm. So it was not possible. And the jury found, they obviously found it persuasive, the testimony of the farm workers, that it wasn't possible for her to be satisfying her obligations at the bus company when, in fact, the testimony was that she was working at the time managing the farm and managing the teenage employees there and handling the cash receipts that the farm obtained. So your case on this point comes down to this, that here's an employee who's salaried to work 35 hours a week or 40 hours a week doing office work. The testimony is that she's not in the office for long periods of time during regular office hours. To the contrary, she is seen working at what appears to be a different full-time job for a different employer at a different place during those office hours. And the government's argument, I think, is that a jury can draw a plausible inference from that circumstantial evidence that she wasn't doing the work that she was paid to do. That's correct, Your Honor. And in addition to that, we have the same argument with respect to Mr. Rocha. And there was testimony at the trial from Mr. Rocha's supervisors that not only was he not present as the night supervisor, but that other people were called, including Mr. Alferez, for instance, to cover for him because things would come up that needed to be done, but Mr. Rocha was not there to do his work. Again, as Your Honor stated, the jury could have made a plausible inference based on Mr. Rocha by himself or Ms. Santos that they were, in fact, not performing their duties. What's the best case that you have that that kind of inference is permissible? I'm sorry, Your Honor? What's the best case that you have, authority, precedent? If I can only read one case in support of this proposition, what case would you want me to read? With respect to the sufficiency of the evidence on that point? Yeah. With this inference that you'd like us to draw, from that absence plus presence elsewhere plus the nature of the word equals an inference that the word wasn't being performed. Well, I guess I would direct Your Honors to the Baldrige case out of the, I believe it's the 10th Circuit, 2010 case, as well as the Sanderson case. In both of those cases, the facts were that individuals who were supposed to be working one place, in fact, worked somewhere else. In one circumstance, I believe the employees did work at the defendant's sister's home. In another circumstance, the employees were working on the private construction projects of the defendant. So I would say that from a factual standpoint, those two cases are the cases that the Court should look to for guidance on this point. I believe they are excellent analogies to the circumstances here. Thank you. Could you tell us something more? Because the briefs were really skimpy on what the relationship was between SRTA, USBC, and the employees of USBC. And this is the problem I'm trying to get my head around. Suppose the contract here had required the USBC to deliver a bushel of apples each week to SRTA. And they did it. Every week, there's a full bushel of apples coming there. Where do you care and how is SRTA harmed under that scenario if one of the employees of USBC is a no-show? I think you're not. On the other hand, if the contract is structured so that you're to receive the services of that employee, then I can see how you're harmed. It wasn't clear to me from the evidence put in the trial which we're talking about here. So, Your Honor, to step back for a second, SRTA was, I believe, created by statute. I believe that's what the evidence showed. And its job was to administer the public transit system for southeastern Massachusetts. They were not charged with operating it. And so they bid out five-year contracts to entities in order to operate the transit service. In this case, there was evidence from Eric Rousseau, who was the SRTA administrator who came in after Mr. Cosentino, the administrator installed by Mr. George to oversee him, that there was a substantial expansion of the bus service when the new SRTA administrator and contractor were brought in to replace Mr. George and Mr. Cosentino. Here, basically the issue was because these employees were not working with the bus company, the bus company wasn't performing its service. They weren't operating the public transit system as best they could. Was there evidence of that? In other words, was there any evidence that, take it back to the contract, can we read the contract as having any cost plus elements in it? I'm not sure that you can, but I can tell you that at trial it came out that when the new SRTA administrator came in, they increased ridership substantially and they increased the hours of service substantially as well when they came in. I think that would be evidence of the fact that USBC was underperforming in the contract. And I would also note that the testimony of Mr. Pacheco and those who were sending him out to the farm was such that he was being pulled off of bus company jobs. He was a mechanic. He was there to fix equipment, and he was being pulled off of those jobs in order to be sent to the farm. That in and of itself is a harm on a much smaller level, obviously, than ridership or number of hours. But all of that evidence came in at trial, and all of that evidence is substantial evidence. And he was pulled off of jobs on multiple occasions? I believe he was, including one in which he was working on a wheelchair lift on one of the buses. If there are no further questions on this point, Your Honors, I'd just like to finish a thread that I started earlier relating to the otherwise legitimate purpose prong. With respect to Newell, the facts there included the payment of ghost workers. And in that case, it involved ghost workers who both worked for a different agency than the one that was funded but were paid with agency funds, and some of them just didn't work the hours that they were supposed to. It also included a payment of travel reimbursement to the son of the defendant. These facts and these payments are not otherwise legitimate purposes. They're illegitimate purposes. And that's just one example, Your Honors, from this court of a factual scenario where the intentional misapplication prong of the statute was applied to an otherwise illegitimate purpose. So it's pretty clear from Newell, as well as from Freeman, which is miscited in the defendant's brief, the Thompson case out of the Seventh Circuit, as well as the Frazier case, that intentional misapplication can include something more than an otherwise legitimate purpose and that these means are overlapping. On a position of trust, the court for sentencing purposes found that George was in a position of trust with respect to SRTA. Is it the government's position that the CEO or owner of any company that contracts with the government, that that individual is in a position of trust with respect to the government agency? I'm not sure we would take that position in every single case. What is it about this one? I can see how perhaps the contracting party, USBC, had contractual obligations that are owed to government. And perhaps in this scenario, some of them might have risen to trust obligations. But how does the owner, whose fiduciary duties would run to his company, how would he have any trust obligations to the government? Well, here I think, particularly because of the unique nature of SRTA, you have a public entity that is charged with administering but not operating a public transit service. I think there's clearly a duty of trust, both private, if it were a private entity that SRTA was private, but also public, because SRTA is a public entity here. So you're saying SRTA serves the public, owes a duty of trust to the public? SRTA does and is also a public entity. So in essence, it's also a public entity. In every case, we're talking about a public entity. And I'm trying to figure out if you're saying automatically the owner of any one of the contracts we should ipso facto find to be in a trust relationship with the entity or whether there's something peculiar here about these facts that renders this individual in a trust situation. I hesitate to say that in every case. I can't think, however, as I stand here right now, of a situation where there wouldn't be a position of trust with respect to a public entity. I do think particularly here because Mr. George was contracting to operate the entire public transit system. But he wasn't contracting, was he? I thought it was USBC that was the contracting party. Right, which he owned. But there's a difference, isn't there? Well, I think here there's not a difference that has any distinction to it. I mean, Mr. George, in essence, was the person who was being contracted with. I mean, he used his political connections and his friendships in order to maintain the contract and also to control CERTA. And I think that's evidence that shows that it really was Mr. George who the relationship was with as opposed to USBC. So are you saying that he had occupied a position of trust with respect to CERTA and abused that position by putting together this unholy deal between CERTA and UBC that wound up with the government money being, federal funding being dissipated? That's exactly right, Your Honor, as well as he had a position of trust with respect to the public. But how did he get a position of trust with respect to SRTA? I mean, he was someone who wanted his company to enter into a contract so that it would make money. But it was the nature of the contract that matters here as well as the nature of the entity with whom he was contracting. The contract was to run the bus service for the entire transit system in southeastern Massachusetts. And he was contracting with an entity that couldn't do that itself because it was prohibited by the statute. Right, so USBC becomes a trust. And the government argues that here, George and USBC, in essence, were one and the same. The relationship was with Mr. George. Have you put in veil-piercing evidence in this case? I do not believe that was part of this case. Have you made an alter ego argument? I don't believe that was an issue that was raised by the defense or that happened below. If there are no further questions, the government would rely on the arguments in its brief and would ask the court to affirm both the convictions and the sentence. Thank you very much, Your Honor. There was a contentious issue during the course of this entire trial as to whether or not the relationship or the nature in which Ms. Santos was being treated was a sexist way because she was not an administrative assistant who did clerical work at the office. She was the assistant administrator. She was second in charge. She made the decisions. She worked 24 hours a day. That was her responsibility. It required more than just doing some grievance work. It required her attending meetings, making decisions, and doing all of those things that a second in command would do. When Ms. Mullins was asked whether or not they did the same jobs she was, what we used to call a secretary, Ms. Mullins, Ms. Mullins said, oh no, she does a lot more than that. And she did a lot more than that. She worked there. She was the longest tenured employee. She didn't work. She wasn't required to be at Potomac Street to do her job. And she wasn't. It sounds like you're saying she was too busy to be at the farm stand so much time. No. It was like, I would contend, and I don't mean to get too horny with you, but when I was in law school and I needed a job, I became a detective, a security guy. While I was doing those jobs as a security guy to see if somebody would come in the building, I was also reading my law books and studying for the bar. It's the same thing. A supervisory position means that you sit there and you see if anything happens. It doesn't mean you can't do something at the same time. I had an office in the house. They called from the house. Not one person indicated what her duties were. There was no evidence as to what her duties were, what her hours were, where she was supposed to be, when she was supposed to be at any particular location. With regard to the last question, the statute, and I believe there was evidence at trial, the statute that creates the original transit authority indicates that an individual cannot own a transit authority or manage a transit authority. It has to be done through a corporation. It has to be done through a company. That's why USBC was created. My brother indicated with regard to some post activity, post end of the contract activity and said that, well, when the new guys came in, they increased the ridership and they increased the hours. He did not mention that they also increased the cost to the company, to the SRTA, in the amount of approximately $2 million. Also, with regard to those increases, the only one who could increase ridership, the only one who could increase time was SRTA. They had to vote it in order to approve it. USBC only managed what SRTA approved. They did that. Thank you. Thank you.